NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-3324-14T4

STEVEN KADONSKY,

        Appellant,

v.

STEVE C. LEE, Acting Director
of the Division of Consumer
Affairs,

        Respondent.

> **APPROVED FOR PUBLICATION**
>
> **October 31, 2017**
>
> **APPELLATE DIVISION**

_____

Argued November 29, 2016 — Decided October 31, 2017

Before Judges Messano, Espinosa, and
Guadagno (Judge Espinosa dissenting).

On appeal from the Division of Consumer
Affairs.

Joseph L. Linares argued the cause for
appellant (Walsh Pizzi O'Reilly Falanga LLP,
attorneys; Marc D. Haefner, Selina M. Ellis
and Mr. Linares, on the briefs).

Jodi C. Krugman, Deputy Attorney General,
argued the cause for respondent (Christopher
S. Porrino, Attorney General, attorney;
Andrea M. Silkowitz, Assistant Attorney
General, of counsel; Ms. Krugman, on the
brief).

Barbour & Associates, LLC, attorneys for
amicus curiae, L.B. on behalf of G.B. (Roger
A. Barbour, on the brief).

The opinion of the court was delivered by

GUADAGNO, J.A.D. (retired and temporarily assigned on recall).

In January 2014, Steven Kadonsky, an inmate serving a sentence for marijuana trafficking,[1] filed a petition with the Director of the Division of Consumer Affairs (Division) seeking to have marijuana rescheduled from a Schedule I controlled dangerous substance to Schedule IV.[2]  Kadonsky argued that because the Legislature determined that marijuana had "a beneficial use . . . in treating or alleviating the pain or other symptoms associated with certain debilitating medical conditions" when it passed the New Jersey Compassionate Use Medical Marijuana Act (CUMMA), N.J.S.A. 24:6I-1 to -16, in 2010, marijuana no longer satisfied one of the requirements for inclusion in Schedule I, that the substance "has no accepted medical use in treatment," N.J.S.A. 24:21-5(a).

On January 9, 2015, the acting director (Director) of the Division denied Kadonsky's petition.  The Director noted that marijuana has been listed as a Schedule I substance since the

---

[1] Pursuant to a plea agreement, Kadonsky pled guilty to the "drug kingpin" statute, N.J.S.A. 2C:35-3, and was sentenced to life imprisonment with a twenty-five year period of parole ineligibility. State v. Kadonsky, 288 N.J. Super. 41, 43 (App. Div.), certif. denied, 144 N.J. 589 (1996).

[2] Alternatively, Kadonsky argued that Schedule V "may be more proper for marijuana."

passing of the federal Controlled Substances Act (CSA) in 1970, see 21 U.S.C.A. § 812(c), and N.J.S.A. 24:21-3(c) requires that he "similarly control the substance" unless he "objects and follows the appropriate process to make the reasons for his objections public."

The Director also found no indication that, in passing CUMMA, the Legislature intended "to treat marijuana similar to or consistent with substances listed in Schedules II-V."

The Director observed that both the New Jersey Department of Health and the Board of Medical Examiners have interpreted CUMMA as neither rescheduling nor permitting the rescheduling of marijuana. Finally, the Director suggested federal law prohibited rescheduling:

> [T]he Department of Health noted that marijuana is not approved by the United States Food and Drug Administration, and cannot be prescribed by physicians or dispensed by pharmacists. The Department explained that changing the classification of marijuana from a Schedule I substance in New Jersey would require a change in existing federal law.

Kadonsky appealed and now argues that the Division's decision is contrary to and inconsistent with the relevant statutes; rescheduling of marijuana is required; and the Director's decision renders much of the statutory scheme superfluous and conflicts with Supreme Court precedent.

We also granted leave to appear as amicus curiae to L.B. on behalf of G.B., a minor child who takes medical marijuana as part of her treatment regimen for uncontrolled epileptic seizures. Amicus argues that the continued scheduling of marijuana as a Schedule I narcotic is arbitrary and capricious; the vast amount of contemporary scientific and medical evidence as to the efficacy of medical marijuana supports the argument that the scheduling of medical marijuana as a Schedule I narcotic is based upon antiquated and outdated scientific fallacies; and, the scheduling of marijuana is of great public and personal importance to amicus and any similarly situated individuals in this state.

I.

Well-recognized principles ascribe a "limited role" to our review of administrative agency determinations. In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). We will not reverse an agency's judgment unless we find the decision to be "arbitrary, capricious, or unreasonable, or [ ] not supported by substantial credible evidence in the record as a whole." Ibid. (quoting Henry, supra, 81 N.J. at 579-80). Our inquiry is limited to:

> (1) whether the agency's action violated the legislative policies expressed or implied in the act governing the agency; (2) whether the evidence in the record substantially

supports the findings on which the agency's actions were premised; and (3) "whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors."

[Barrick v. State, 218 N.J. 247, 260 (2014) (quoting In re Carter, 191 N.J. 474, 482 (2007)).]

We owe no deference to an administrative agency's "interpretation of a statute or its determination of a strictly legal issue." L.A. v. Bd. of Educ., 221 N.J. 192, 204 (2015) (quoting Mayflower Sec. v. Bureau of Securities, 64 N.J. 85, 93 (1973)).

The CSA places hazardous drugs in five categories, or schedules, which impose varying restrictions on access to the drugs. See 21 U.S.C.A. § 812 (1988). Marijuana is assigned by statute to Schedule I, the most restrictive of these. A drug is placed in Schedule I if (1) it "has a high potential for abuse," (2) it has "no currently accepted medical use in treatment in the United States," and (3) "there is a lack of accepted safety for use of the drug . . . under medical supervision." Ibid.

In 1971, the New Jersey Controlled Dangerous Substances Act (CDSA), N.J.S.A. 24:21-1 to -56, became effective and gave the Director the authority to "add substances to or delete or reschedule all substances enumerated in the schedules." N.J.S.A.

24:21-3(a). In determining whether to control a substance, the Director is obligated to consider:

> (1) Its actual or relative potential for abuse;
>
> (2) Scientific evidence of its pharmacological effect, if known;
>
> (3) State of current scientific knowledge regarding the substance;
>
> (4) Its history and current pattern of abuse;
>
> (5) The scope, duration, and significance of abuse;
>
> (6) What, if any, risk there is to the public health;
>
> (7) Its psychic or physiological dependence liability; and
>
> (8) Whether the substance is an immediate precursor of a substance already controlled under this article.
>
> [Ibid.]

After considering the above factors, the Director is required to "make findings . . . and . . . issue an order controlling the substance if he finds that the substance has a potential for abuse." Ibid. The Director is required to "similarly control" any "substance . . . designated, rescheduled or deleted as a controlled dangerous substance under Federal law." N.J.S.A. 24:21-3(c).

At the outset, we note a conflict between section (a) of N.J.S.A. 24:21-3, which appears to grant the Director the authority to "add substances to or delete or reschedule all substances," and subsection (c) which seemingly limits the Director's ability to reclassify controlled dangerous substances differently than they are classified under federal law.

Our Supreme Court provided guidance in resolving this conflict when it decided State v. Tate, 102 N.J. 64 (1986). Tate involved a quadriplegic defendant charged with possession of marijuana. Id. at 66-67. The defendant argued his use of marijuana was a "medical necessity" because it was the only treatment that eased the pain of recurring, spastic contractions which at times were "so severe as to render [him] completely disabled." Ibid.

A divided Court rejected Tate's argument. Writing for the majority, Justice Clifford noted that N.J.S.A. 24:21-5(a) classified marijuana as a Schedule I controlled dangerous substance, which indicated that "the legislature has determined that marijuana has 'high potential for abuse' and has 'no accepted medical use in treatment . . . or lacks accepted safety for use in treatment under medical supervision.'" Id. at 70.

However, Justice Clifford also observed that the Legislature "demonstrated foresight by leaving room for the

7

possibility that scientific developments and advances in knowledge could ultimately render marijuana's Schedule I classification inappropriate," and noted that N.J.S.A. 24:21-3(a) "granted to the Commissioner of Health the authority to reschedule marijuana . . . giving consideration to, inter alia, current scientific knowledge." Id. at 71. Years later, Justice Clifford's words would prove prophetic.

Clearly, the CDSA did not contemplate a medicinal exception for the use or possession of marijuana. Indeed, when the CDSA was enacted, no state permitted the medicinal use of marijuana. In 1996, California became the first state to legalize medical marijuana.[3] In 2010, New Jersey enacted CUMMA, creating a limited exception, de-criminalizing possession of marijuana for medical use by qualifying patients who obtain the appropriate registry identification card. N.J.S.A. 24:6I-6; N.J.S.A. 2C:35-17.

Currently, twenty-nine states, the District of Colombia, Puerto Rico, and Guam, have legalized medical marijuana; twenty-one states and the District of Columbia have decriminalized the possession of marijuana; and eight states and the District of

_____

[3] Cal. Health & Safety Code § 11362.5.

Columbia have passed laws regulating the recreational use of marijuana in the same manner as alcohol.[4]

Scientific research suggests that marijuana has "potential therapeutic value" for "pain relief, control of nausea and vomiting, and appetite stimulation." Institute of Medicine, Marijuana and Medicine:  Assessing the Science Base (J. Joy, S. Watson, and J. Benson eds. 1999), http://medicalmarijuana.procon.org/sourcefiles/IOM_Report.pdf . In addition, it has been reported that marijuana:  reduces muscle spasms and spasticity; reduces intraocular pressure; and reduces anxiety. Ibid.  Moreover, marijuana has been used successfully to treat the debilitating symptoms of cancer and cancer chemotherapy, AIDS, multiple sclerosis, epilepsy, glaucoma, anxiety, and other serious illnesses. Ibid.

Amicus L.B., on behalf of her daughter G.B., argues the continued classification of marijuana as a Schedule I controlled dangerous substance frustrates the purposes of CUMMA and denies G.B. the constitutionally protected right to a free and appropriate education.

G.B., a teenager, suffers from uncontrolled grand mal and petit mal epileptic seizures.  Before she was prescribed medical

---

[4] For a list of states that have decriminalized or legalized marijuana, see http://norml.org/marijuana/personal .

A-3324-14T4

marijuana, G.B. suffered at least one grand mal and several petit mal seizures daily. Since she began taking medical marijuana as part of her treatment regimen, her grand mal seizures decreased by forty to fifty per-cent with greatly reduced severity, and her petit mal seizures were "essentially eliminated." L.B. confirmed that medical marijuana is the only medication that significantly reduces her daughter's seizures.

G.B.'s doctor prescribed four to five doses of medical marijuana per day, with one dose given at lunchtime.[5] G.B. attends a special education school, located approximately thirty minutes from her home. When G.B.'s parents requested that the school's nurse administer G.B.'s medical marijuana, the school refused because marijuana is a Schedule I substance and cannot be permitted on school grounds. G.B. was required to leave school at lunchtime to receive her medication and did not return to school, causing her to miss a half day of school each day.

L.B. petitioned the Department of Education (DOE) to require the school to administer G.B.'s medication. The matter was referred to the Office of Administrative Law. After hearing oral argument, an administrative law judge (ALJ) dismissed L.B.'s petition, noting that marijuana was a Schedule I

---

[5] The medical marijuana prescribed to G.B. is in oil form and can be taken mixed with a liquid.

A-3324-14T4

substance, and because N.J.S.A. 2C:35-7 prohibited dispensing or possessing it with intent to distribute within 1000 feet of school property, the school nurse was not authorized to administer G.B.'s medication.

L.B. then filed a petition for emergent relief to permit her to come to school each day at lunchtime to administer her daughter's medical marijuana during school hours. The school opposed the petition and proposed alternatively that L.B. travel to school, pick up her daughter, take her at least 1000 feet away from school grounds, administer the medication, and return her to school. On September 15, 2015, the ALJ denied the petition, finding L.B. had not met the standards for emergent relief set for the in Crowe v. DeGoia, 90 N.J. 126 (1982). The judge did note that CUMMA was in "direct conflict" with the school zone statute, N.J.S.A. 2C:35-7.

On November 9, 2015, N.J.S.A. 18A:40-12.22 became effective which permits "parents, guardians, and primary caregivers to administer medical marijuana to a student while the student is on school grounds." The amendment does not authorize school personnel, including nurses, to administer medical marijuana.[6]

--------

[6] On November 14, 2016, a Bill was introduced in the Senate, which would allow for secondary caregivers to administer medical marijuana to qualifying patients. S. 2794, 217th Leg. (2016). The Bill defines a secondary caregiver as an "adult employee of
(continued)

G.B. observes that if marijuana was reclassified as a Schedule III drug, school nurses would be able to administer her prescribed doses of medical marijuana. Because G.B. is not able to receive marijuana at school, she attends only half days and claims she is not receiving an appropriate education.

The CDSA requires the Director to place a substance in Schedule I "if he finds that the substance: (1) has high potential for abuse; and (2) has no accepted medical use in treatment in the United States; or lacks accepted safety for use in treatment under medical supervision." N.J.S.A. 24:21-5(a).

While there may have been "no accepted medical use in treatment in the United States" for marijuana when the CDSA became effective, any argument suggesting that premise is still valid in the post-CUMMA era strains credulity beyond acceptable boundaries.[7] Medical benefits from the use of marijuana not known in 1971, when the CDSA became effective, or in 1986, when Tate was decided, and impediments to its lawful use as a result of its Schedule I classification, are abundant and glaringly apparent now.

_____

(continued)
a patient's school or facility . . . who is authorized . . . by the patient for primary caregiver."

[7] The State appears to concede, "for purposes of argument" only, that the enactment of CUMMA supports a finding that marijuana has an accepted medical use in treatment.

Similarly, the statement by the <u>Tate</u> Court that "the value of medical use of marijuana cannot be deemed to outweigh the values served by its prohibition," 102 <u>N.J.</u> at 74, must now be questioned and perhaps revisited, especially when considering the difficulties encountered by G.B. and others who may be similarly situated, caused by the Schedule I classification.

In 2005, the Supreme Court decided <u>Gonzales v. Raich</u>, 545 <u>U.S.</u> 1, 125 <u>S. Ct.</u> 2195, 162 <u>L. Ed.</u> 2d 1 (2005), involving two seriously ill California citizens (patients) who used marijuana for medical purposes on the recommendation of their doctors. One patient suffered from an inoperable brain tumor and a seizure disorder. Her doctor opined that without marijuana treatments she would suffer excruciating pain and could very well die. <u>Id.</u> at 6-7, 125 <u>S. Ct.</u> at 2199-2000, 162 <u>L. Ed.</u> 2d at 12. Local sheriffs and agents from the Drug Enforcement Agency came to the home of one of the patients. Although the county officials concluded the marijuana use was permissible under California law, the federal agents seized and destroyed all six of the patient's marijuana plants. <u>Id.</u> at 7, 125 <u>S. Ct.</u> at 2200, 162 <u>L. Ed.</u> 2d at 12-13.

The patients sought injunctive and declaratory relief against the enforcement of federal CSA as it pertains to their

cultivating and using marijuana for doctor-prescribed purposes. Id. at 7, 125 S. Ct. at 2200, 162 L. Ed. 2d at 12.

The Supreme Court held that Congress' authority under the Commerce Clause includes the power to prohibit intrastate cultivation and use of marijuana, even if it is in compliance with California law. Id. at 32-33, 125 S. Ct. at 2214-215, 162 L. Ed. 2d at 28-29. However, the Court "acknowledge[d] that evidence proffered by respondents in this case regarding the effective medical uses for marijuana, if found credible after trial, would cast serious doubt on the accuracy of the findings that require marijuana to be listed in Schedule I." Id. at 27 n.37, 125 S. Ct. at 2211 n.37, 162 L. Ed. 2d at 25 n.37.

Upon review, marijuana's continued classification as a Schedule I substance in New Jersey, would depend, in part, on a determination that it has a high potential for abuse and, if so, whether that factor justifies continued inclusion in the face of compelling evidence of accepted medical use and impediments to its legal use which may be attributable to its classification. The State concedes there is disagreement in the medical community as to whether marijuana poses a high potential for abuse.

While this issue is not squarely before us, it is certainly ripe for a determination by the Director.[8]  When the inconsistencies of sections (a) and (c) of N.J.S.A. 24:21-3 are viewed through the prism of the dicta[9] in Tate, we conclude that the Director erred in determining he lacked the authority to reclassify marijuana without a change in existing federal law.

Our dissenting colleague suggests that the sole issue presented by this appeal is whether the Director "was required to reschedule marijuana, removing it from Schedule I of the

---

[8] Other courts have rejected arguments that it is unconstitutional for the government to continue to classify marijuana as a Schedule I controlled substance. See e.g., Americans for Safe Access v. DEA, 706 F.3d 438, 453 (D.C. Cir. 2013) (finding DEA's denial of petition to reclassify marijuana as a Schedule III, IV or V drug was not arbitrary or capricious); United States v. Ernst, 857 F. Supp. 2d 1098, 1103-04 (D. Or. 2012) (rejecting defendant's claim that continued classification of marijuana as Schedule I substance violated his due process and equal protection rights); Cracker v. DEA, 714 F.3d 17, 19 n.1 (1st Cir. 2013) ("Although considerable efforts have been made to reschedule marijuana, it remains a Schedule I substance.").  These cases, brought by defendants prosecuted for criminal violations, do not address problems caused by the Schedule I classification experienced by lawful medical marijuana users.

[9] Our dissenting colleague notes that the language we rely on in Tate is dicta and suggests that is "not germane to that holding."  Post at 21.  Even though Justice Clifford's statement that the Commissioner of Health has authority to reschedule marijuana may not have been "essential to the disposition of the case," it is nevertheless authoritative as "it is expressly declared by the court as a guide for future conduct" and must be considered a "binding decision[] of the court." State v. Rose, 206 N.J. 141, 182-83 (2011) (quoting 21 C.J.S. Courts §230 (2006) and 5 Am. Jur. 2d Appellate Review § 564 (2007).

[CDSA]." Post at 1.  To be clear, our opinion does not mandate reclassification, we simply hold that the Director erred in determining he lacked authority to reclassify.  We note that  if the Director decides to remove marijuana from Schedule I, that would not decriminalize it, as possession or sale of substances under other schedules are illegal.  See, e.g., N.J.S.A. 2C:35-5 (13) (Schedule I, II, III, IV substances); N.J.S.A. 2C:35-5 (14) (Schedule V substance).

N.J.S.A. 24:21-3(c) provides:

> If any substance is designated, rescheduled or deleted as a controlled dangerous substance under federal law and notice thereof is given to the director, the director shall similarly control the substance under P.L.1970, c.226, as amended and supplemented, after the expiration of 30 days from publication in the Federal Register of a final order designating a substance as a controlled dangerous substance or rescheduling or deleting a substance, unless within that 30-day period, the director objects to inclusion, rescheduling, or deletion.  In that case, the director shall cause to be published in the New Jersey Register and made public the reasons for his objection and shall afford all interested parties an opportunity to be heard. At the conclusion of any such hearing, the director shall publish and make public his decision, which shall be final unless the substance is specifically otherwise dealt with by an act of the Legislature. Upon publication of objection to inclusion or rescheduling under P.L.1970, c.226 (C.24:21-1 et seq.) by the director, control of such substance under this section shall automatically be stayed until such

time as the director makes public his final decision.

The director may by regulation exclude any nonnarcotic substance from a schedule if such substance may, under the provisions of federal or State law, be lawfully sold over the counter without a prescription, unless otherwise controlled pursuant to rules and regulations promulgated by the division.

The dissent argues that any such action by the Director is precluded because the objection "must be made within the thirty-day period following publication; there is no authority granted to the Director to object thereafter." Post at 11. However, 21 U.S.C.A. 812(a), requires that the five schedules of controlled substances "shall be updated and republished on a semiannual basis during the two-year period beginning one year after the date of enactment of this title [enacted Oct. 27, 1970] and shall be updated and republished on an annual basis thereafter." N.J.S.A. 24:21-3(d) provides that the "director shall update and republish the schedules in sections 5 through 8.1 of P.L.1970, c.226, as amended and supplemented . . . periodically." At a minimum, the thirty-day window permitting the Director to object to a schedule classification, will reoccur on an annual basis.

Our dissenting colleague cites no authority to support her conclusion that the Director may only object to "a new decision made regarding the federal schedules" and "is not authorized to revisit established federal schedules and differ with the

designations already made." Post at 11.  If the Legislature had intended to place such limitations on the Director's review, it surely could have done so in the statute.  Moreover, a review of classification by the Director based, not on changes to the federal schedule, but on "scientific developments and advances in knowledge [which] could ultimately render marijuana's Schedule I classification inappropriate" is exactly what the Tate Court anticipated. Tate, supra, 102 N.J. at 71.

Finally, we reject our dissenting colleague's conclusion that "[b]ecause [N.J.S.A. 24:21-3(a)] applies to the Director's decision '[i]n determining whether to control a substance,' (emphasis in dissent), it presupposes the substance in question is not controlled at the time of the determination, that it is not listed on any federal schedule and that the Director is making an initial determination to control it or not."  This finding is unsupported by any authority and is contradicted by N.J.S.A. 24:21-3(a) which clearly states "The director may add substances to or delete or reschedule all substances enumerated in the schedules in [N.J.S.A. 24:21-5 through N.J.S.A. 24:21-8.1]." (Emphasis added).  The original bill incorporated a large list of substances pre-scheduled upon enactment, including "Marihuana."  The Director is authorized to add, delete, or reschedule all substances enumerated, and is not limited to

substances "not controlled at the time of the determination" as our colleague suggests.

This matter is remanded to the Director for proceedings consistent with our opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3324-14T4

**ESPINOSA, J.A.D., dissenting.**

The question presented by this appeal is whether, as a result of evolving attitudes about marijuana and its potential for medical uses, the Director of the Division of Consumer Affairs was required to reschedule marijuana, removing it from Schedule I of the New Jersey Controlled Dangerous Substances Act (CDSA), N.J.S.A. 24:21-1 to -56.  The Director's decision that he was required, instead, to control marijuana in accord with federal schedules is subject to limited appellate review. Circus Liquors, Inc. v. Governing Body of Middletown, 199 N.J. 1, 9 (2009). In light of the unambiguous language of N.J.S.A. 24:21-3(c) that the Director adhere to federal schedules, his decision must be sustained because there is no "'clear showing' that it is arbitrary, capricious, or unreasonable or that it lacks fair support in the record." Ibid.

My colleagues conclude the Director erred in his interpretation of the law but do not conclude the Director's decision was arbitrary, capricious or unreasonable or consider that a fair interpretation of the governing statute provides support for his decision.  They have elected to decide an issue they acknowledge "is not squarely before us."  Despite the clear directive in N.J.S.A. 24:21-3(c), the majority concludes the

Director may reconsider the classification of marijuana, placing it on a schedule different from its designation on the federal schedules and, because the issue is "ripe for determination" by the Director, remands the issue for his consideration.

The necessary premise for this conclusion is that the Director has the discretion to make a major policy decision regarding the scheduling of marijuana that directly conflicts with the legislative mandate contained in N.J.S.A. 24:21-3(c) and federal law. That premise cannot withstand the application of established principles of statutory construction.

First of all, the plain language of N.J.S.A. 24:21-3(c) requires that the schedules established by the Director be the same as the federal schedules. The legislative scheme provided by the CDSA reflects that N.J.S.A. 24:21-3(c) is but one expression of the Legislature's recognition of the primacy of federal regulation in this area.[1] See State v. Metcalf, 168 N.J.

---

[1] N.J.S.A. 26:2L-6(a) explicitly makes the Controlled Dangerous Substances Therapeutic Research Act (TRA), N.J.S.A. 26:2L-1 to -9 subject to federal law. ("The commissioner shall enter into an agreement with the National Institute on Drug Abuse for receipt of a Schedule I controlled dangerous substance for the purposes prescribed in this act, subject to the provisions of all Federal controlled dangerous substances laws and rules adopted pursuant to such laws." (Emphasis added)). See also N.J.S.A. 26:2L-7; N.J.S.A. 26:2L-8; N.J.S.A. 26:2L-9 and N.J.A.C. 13:45H-10.1, which incorporates the federal controlled dangerous substance schedules by reference, N.J.A.C. 13:45H-10.1(a) and identifies
(continued)

<u>Super.</u> 375, 378 (App. Div.) (observing the CDSA "is modeled, and is largely dependent, on the corresponding federal regulatory provisions"), <u>certif. denied</u>, 81 <u>N.J.</u> 411 (1979).  A review of extrinsic evidence similarly establishes the mandatory nature of <u>N.J.S.A.</u> 24:21-3(c).  Finally, although the Director's decision is properly affirmed based upon the statute's language and the Legislature's intent, any decision to schedule marijuana differently from the federal schedule is preempted by the federal Controlled Substances Act (CSA), 21 <u>U.S.C.A.</u> § 801 to § 904, pursuant to the Supremacy Clause of the United States Constitution, <u>U.S. Const.</u> art. VI, cl. 2.  For these reasons, I respectfully dissent.

The majority has reviewed the personal circumstances of the amicus and cited some reference materials to suggest that the reclassification of marijuana would be a worthy and compassionate change in the law whose time has come.  Intending no disrespect to the sincerely held beliefs of persons who advocate for that outcome, that is not our call to make and, to provide a broader context for the issue at hand, it should be recognized that the consequences of removing marijuana from Schedule I are not trivial.

---

(continued)
any reference to controlled dangerous substance schedules in the regulations as the federal schedules, <u>N.J.A.C.</u> 13:45H-10.1(b).

Because the drug kingpin statute, N.J.S.A. 2C:35-3 applies only to "any controlled dangerous substance classified in Schedule I or II," it is possible that the offense for which the appellant was convicted would no longer exist.[2]  See also N.J.S.A. 2C:35-9 (establishing a first-degree offense and imposing strict liability for a drug-induced death caused by a controlled dangerous substance classified in Schedules I or II).

Perhaps the greatest irony that would result from the suggested reclassification of marijuana lies in the impact it would have upon the Controlled Dangerous Substances Therapeutic Research Act (TRA), N.J.S.A. 26:2L-1 to -9.  The TRA was intended to support research that is generally understood to assess the use of marijuana for medical purposes.  The TRA does not, however, mention marijuana or marihuana by name.  Instead, the Legislature's stated purpose in enacting the TRA was to support research regarding the "use of certain Schedule I controlled dangerous substances [to] alleviate the nausea and

---

[2] I do not suggest that the reclassification of marijuana would have any impact on Kadonsky's conviction.  An alteration in its classification would have no effect because marijuana was on Schedule I at the time of his offense.   See United States v. Springer, 354 F.3d 772, 775 (8th Cir.) cert. denied, 542 U.S. 914, 124 S. Ct. 2866, 159 L. Ed. 2d 285 (2004); United States v Jones 480 F.2d 954, 960 (5th Cir.), cert. denied, 414 U.S. 1071, 94 S. Ct. 582, 38 L. Ed. 2d 476, (1973).

ill-effects of certain medical treatment, such as cancer chemotherapy, and, additionally, [to] alleviate the ill-effects of certain diseases, such as glaucoma."  N.J.S.A. 26:2L-2. Therefore, if, upon remand, the Director elected to remove marijuana from Schedule I, the research program established by the TRA to evaluate therapeutic uses of marijuana would be eviscerated.

## I.

"Courts should not reach a constitutional question unless its resolution is imperative to the disposition of litigation." Randolph Town Ctr., L.P. v. County of Morris, 186 N.J. 78, 80 (2006).  Although the application of principles of statutory interpretation adequately resolves the issue before us, a brief discussion of the potential federal preemption issue provides useful context for the analysis of N.J.S.A. 24:21-3 that follows.

The CSA established "a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." Gonzales v. Raich, 545 U.S. 1, 13, 125 S. Ct. 2195, 2203, 162 L. Ed. 2d 1, 16 (2005) (citing 21 U.S.C.A. §§ 841(a)(1), 844(a). "By classifying marijuana as a Schedule I drug," Congress made "the manufacture, distribution, or possession of marijuana . . .

a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration pre-approved research study."  Id. at 14, 125 S. Ct. at 2204, 162 L. Ed. 2d at 17.  The research program established by the TRA is correspondingly "limited to therapeutic research programs presently conducted by the Bureau of Drugs in the Food and Drug Administration of the U.S. Department of Health and Human Services or its successor." N.J.S.A. 26:2L-4(a).

21 U.S.C.A. § 903 defines the scope of the CSA's preemption, limiting it to circumstances where "there is a positive conflict between" a provision of Title 21 and a state law "so that the two cannot consistently stand together."  Ibid. "Such a conflict can arise when it is impossible to comply with both federal and state requirements or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Beek v. City of Wyo., 846 N.W. 2d 531, 537 (2014) (citation omitted).  When, however, it is possible to comply with both the CSA's prohibition of marijuana and a state statute that provides limited state-law immunity for medical marijuana use, there is no "positive conflict" that triggers preemption.  Id. at 537-38.  In enacting the New Jersey Compassionate Use Medical Marijuana Act (CUMMA), N.J.S.A. 24:6I-1 to -16, the Legislature expressed its intent to

steer clear of such a conflict, declaring that "compliance with this act does not put the State of New Jersey in violation of federal law." N.J.S.A. 24:6I-2(d).

An interpretation of N.J.S.A. 24:21-3 as granting the Director the discretion to remove marijuana from Schedule I would permit the assertion of regulatory authority untethered to the limited immunity from state prosecution for medical uses of marijuana.[3] Plainly, if marijuana is deleted from Schedule I, that provision of the CDSA "cannot consistently stand" with the CSA's continued prohibition of marijuana and inclusion of marijuana on the federal Schedule I. Because such action would conflict with the "closed regulatory system" established by the CSA, it would run afoul of the purpose Congress expressed in 21 U.S.C.A. 903 and be preempted by federal law.

## II.

Our "fundamental objective . . . is to identify and promote the Legislature's intent," Parsons ex rel. Parsons v. Mullica Twp. Bd. of Educ., 226 N.J. 297, 307 (2016). The appropriate starting place for determining the meaning of N.J.S.A. 24:21-3 is its plain language. State v. Gandhi, 201 N.J. 161, 176

---

[3] "Marijuana remains illegal under federal law, even in those states in which medical marijuana has been legalized." United States v. Canori, 737 F.3d 181, 184 (2d Cir. 2013) (citing 21 U.S.C.A. § 903).

(2010). "If the statutory language is clear and unambiguous, and susceptible to only one interpretation, courts should apply the statute as written without resort to extrinsic interpretive aids." In re Passaic Cty. Utils. Auth., 164 N.J. 270, 299 (2000).

The Director's authority to administer the provisions of the CDSA is governed by N.J.S.A. 24:21-3. N.J.S.A. 24:21-3(c) states, in pertinent part,

> If any substance is designated, rescheduled or deleted as a controlled dangerous substance under federal law . . . the director shall similarly control the substance under [the CDSA].
>
> [(Emphasis added).]

The command to "similarly control" any substance scheduled under federal law is clear and unambiguous. However, the majority found that a conflict exists between this section, which states what the director "shall" do and N.J.S.A. 24:21-3(a), which states what the director "may" do. In describing this conflict, the majority states subsection (c) "seemingly limits the Director's ability to reclassify controlled dangerous substances differently than they are classified under federal law." (Emphasis added). This mischaracterization of the statute's plain language opens the door to an elevated interpretation of subsection (a) that ignores the consequences

of the Legislature's use of "shall" and "may" in the two subsections.

"Under the 'plain meaning' rule of statutory construction, the word 'may' ordinarily is permissive and the word 'shall' generally is mandatory." Aponte-Correa v. Allstate Ins. Co., 162 N.J. 318, 325 (2000). Therefore, when "a statutory provision contains both the words 'may' and 'shall,' it is presumed that the lawmaker intended to distinguish between them, 'shall' being construed as mandatory and 'may' as permissive." Ibid.; see also Diodato v. Camden Cty. Park Comm'n, 136 N.J. Super. 324, 327 (App. Div. 1975) ("Whenever the word 'shall' appears in a statute, it creates a presumption that what is thus commanded must be done."). Clearly, then, the plain language of this subsection commands the Director to schedule controlled dangerous substances in conformity with federal schedules. There is no countervailing command in any of the other subsections of N.J.S.A. 24:21-3.

N.J.S.A. 24:21-3(a) states, in pertinent part: "The director may add substances to or delete or reschedule all substances enumerated in the schedules in [N.J.S.A. 24:21-5 through N.J.S.A. 24:21-8.1]. In determining whether to control a substance, the director shall consider" certain enumerated factors. (Emphasis added). There is nothing in subsection (a),

however, that absolves the Director of the obligation contained in subsection (c) to control marijuana in the same manner as it is controlled under federal law.[4]

The only opening in N.J.S.A. 24:21-3 for the Director to disagree with federal designations is found in subsection (c),[5] which affords the Director a limited opportunity to object to the scheduling of a controlled dangerous substance. The scope of this authority to object is best understood when viewed within context:

> If any substance is designated, rescheduled or deleted as a controlled dangerous substance under federal law and notice thereof is given to the Director, the Director shall similarly control the substance under [the CDSA], as amended and

---

[4] The revisions to N.J.S.A. 24:21-3 prior to its enactment also evince a legislative intent to grant only a limited authority to the Director under subsection (a). See Parsons, supra, 226 N.J. at 308 (noting legislative history may provide guidance in statutory interpretation). The Senate bill provided, "The commissioner shall administer the provisions of this act and shall control all substances enumerated in sections 5 through 8 of this act." (Emphasis added). The language thus included both the command, "shall," and an unlimited scope of control, over "all substances." Senate Bill No. 851, 194th Legislature (May 7, 1970). The final text of the bill removed "shall," substituted the permissive "may," and defined a more limited scope of authority: "The commissioner shall administer the provisions of this act and may add substances to or delete or reschedule all substances enumerated in the schedules in sections 5 through 8 of this act." In contrast, the command, "shall," is present in subsection (c) of both the Senate bill and the law as enacted. L. 1970, c. 226.

[5] Subsection (b), which addresses the designation of precursors, is not relevant to this discussion.

supplemented, after the expiration of 30 days from publication in the Federal Register of a final order designating a substance as a controlled dangerous substance or rescheduling or deleting a substance, <u>unless within that 30-day period, the director objects to inclusion, rescheduling, or deletion</u>.  In that case, the director shall cause to be published in the New Jersey Register and made public the reasons for his objection and shall afford all interested parties an opportunity to be heard. At the conclusion of any such hearing, the director shall publish and make public his decision, which shall be final unless the substance is specifically otherwise dealt with by an act of the Legislature. Upon publication of objection to inclusion or rescheduling under ([<u>N.J.S.A.</u>] 24:21-1 et seq.) by the director, control of such substance under this section shall automatically be stayed until such time as the director makes public his final decision.

The director may by regulation exclude any nonnarcotic substance from a schedule if such substance may, under the provisions of federal or State law, be lawfully sold over the counter without a prescription, unless otherwise controlled pursuant to rules and regulations promulgated by the division.

[<u>N.J.S.A.</u> 24:21-3(c) (emphasis added).]

The authorization to "object" is therefore limited both as to the time in which the objection may be made and as to the federal action to which the Director may object.  The objection

must be made within the thirty-day period following publication;[6] there is no authority granted to the Director to object thereafter.  The authority granted is to object to "a final order <u>designating</u> a substance as a controlled dangerous substance or <u>rescheduling</u> or <u>deleting</u> a substance."  <u>Ibid.</u> (Emphasis added).  The objection authorized is therefore to respond to a new decision made regarding the federal schedules. The Director is not authorized to revisit established federal schedules and differ with the designations already made.  Such a grant of authority would inexplicably conflict with the command in this very subsection that the Director "similarly control" any substance under the CDSA "[i]f [the] substance is designated, rescheduled or deleted as a controlled dangerous substance under federal law."  <u>Ibid.</u>

When construing a statute, "'the intention of the Legislature is to be derived from a view of the entire statute' and all provisions 'must be read together in light of the general intent of the act.'"  <u>Perez v. Zagami, LLC</u>, 218 <u>N.J.</u> 202, 211 (2014) (quoting <u>Hubner v. Spring Valley Equestrian</u>

---

[6] Because <u>N.J.S.A.</u> 24:21-3(d) requires the Director to "update and republish the schedules in [the CDSA] periodically," the majority posits that the thirty-day window for objection by the Director will recur annually.  However, that subsection fails to vest the Director with any authority to depart from the federal schedules.

Ctr., 203 N.J. 184, 195 (2010)). "We presume that the Legislature created subsections [of a statute] as a cohesive whole. That presumption cautions against an asserted plain language reading of [one subsection] that appears at odds with related phraseology in its sister subsection[]." Ibid.

In my view, an interpretation of N.J.S.A. 24:21-3 that permits the Director to revisit schedules established by federal regulation and schedule any controlled substance differently would yield the type of absurd result that must be avoided. Perez, supra, 218 N.J. at 214. Any perceived ambiguity is dispelled by a close reading of the subsections, guided by the principle that the statute must be read "together as a whole, giving meaning to each of its parts, harmonizing" the subsections to effect the Legislature's intent. Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 586-87 (2012); Hubner, supra, 203 N.J. at 194-95; Brown v. Brown, 86 N.J. 565, 577 (1981) ("Each subsection should be read with respect to the subject matter of the others and in harmony with each other and with the whole.").

As noted, N.J.S.A. 24:21-3(c) commands the Director to "similarly control" any substance in accord with federal schedules. Because subsection (a) applies to the Director's decision "[i]n determining whether to control a substance,"

(emphasis added), it presupposes the substance in question is not controlled at the time of the determination, that it is not listed on any federal schedule and that the Director is making an initial determination to control it or not. Similarly, when the opportunity to object to federal action included in subsection (c) is scrutinized, it is reasonably interpreted to be consistent with the directive that the Director follow federal schedules in scheduling a substance under the CDSA.

The plain language of the statute, viewed in light of established principles of statutory construction, therefore compels the conclusion the Director's decision that he lacks the authority to depart from federal schedules to remove marijuana from Schedule I was not arbitrary, capricious or unreasonable.

III.

If, however, I accept the majority's premise that differing interpretations are possible, a review of extrinsic evidence[7] does not support a contrary conclusion.

---

[7] If statutory provisions are susceptible to more than one interpretation, extrinsic evidence, such as "legislative history and committee reports," may inform our analysis. Parsons, supra, 226 N.J. at 308 (quoting State v. Marquez, 202 N.J. 485, 500 (2010)); Wilson, supra, 209 N.J. at 572. Extrinsic evidence is also properly considered "if a literal reading of the statute would yield an absurd result, particularly one at odds with the overall statutory scheme." Ibid.; DiProspero v. Penn, 183 N.J. 477, 493 (2005); see, e.g., Perez, supra, 218 N.J. at 214-16.

A.

From the Legislature's first recognition of possible medical uses of marijuana to the present, it has consistently drawn a distinction between marijuana for medical uses and marijuana for non-medical uses. That distinction would cease to exist if the Director were permitted to remove marijuana from Schedule I.

Since its inception, the CDSA has listed "Marihuana" in Schedule I, N.J.S.A. 24:21-5(e)(10). This is consistent with the scheduling of "marihuana" in the federal statute, 21 U.S.C.A. § 812(c), Schedule I(c)(10), and federal regulations, 21 C.F.R. § 1308.11(d)(23) (2017). The CDSA became effective in January 1971, L. 1970, c. 226, and I agree with the majority that it is quite likely the Legislature did not anticipate a medicinal use for marijuana when it was enacted.

Just eleven years after marijuana was listed on Schedule I, our Legislature did contemplate such use when it enacted the TRA and stated its findings:

> [M]edical research has shown that the therapeutic use of certain Schedule I controlled dangerous substances may alleviate the nausea and ill-effects of certain medical treatment, such as cancer chemotherapy, and, additionally, may alleviate the ill-effects of certain diseases, such as glaucoma. The Legislature further recognizes that there is a need for further therapeutic research with regard to

the use of such controlled dangerous substances for these purposes under strictly controlled circumstances.

[N.J.S.A. 26:2L-2 (emphasis added).]

Despite the possibility of therapeutic uses, marijuana remained a Schedule I controlled dangerous substance. The Supreme Court noted the Legislature had "weighed the competing value of medical use of marijuana against the values served by prohibition of its use or possession," defined "the narrow circumstances under which" the value of medical use "may be served," and determined marijuana continued to be prohibited "[o]utside those narrow circumstances." State v. Tate, 102 N.J. 64, 74 (1986).

In 2009, the Legislature enacted CUMMA and made the following declaration of its findings:

> a. Modern medical research has discovered a beneficial use for marijuana in treating or alleviating the pain or other symptoms associated with certain debilitating medical conditions, as found by the National Academy of Sciences' Institute of Medicine in March 1999;
>
> b. [C]hanging state law will have the practical effect of protecting from arrest the vast majority of seriously ill people who have a medical need to use marijuana;
>
> c. Although federal law currently prohibits the use of marijuana, the laws of [thirteen states] permit the use of marijuana for medical purposes . . . . New

16

Jersey joins this effort for the health and welfare of its citizens;

d. States are not required to enforce federal law or prosecute people for engaging in activities prohibited by federal law; therefore, compliance with this act does not put the State of New Jersey in violation of federal law; and

e. Compassion dictates that <u>a distinction be made between medical and non-medical uses of marijuana</u>.  Hence, <u>the purpose of this act is to protect from arrest, prosecution, property forfeiture, and criminal and other penalties, those patients who use marijuana to alleviate suffering from debilitating medical conditions</u>, as well as their physicians, primary caregivers, and those who are authorized to produce marijuana for medical purposes.

[<u>N.J.S.A.</u> 24:6I-2 (emphasis added).]

The Legislature thus advanced from recognizing the <u>possible</u> therapeutic use of marijuana in the TRA to a more concrete finding, that "[m]odern medical research has discovered a beneficial use for marijuana."  <u>N.J.S.A.</u> 24:6I-2(a). Significantly, the Legislature acknowledged that the use of marijuana remained prohibited by federal law, <u>N.J.S.A.</u> 24:6I-2(c), and made no effort to repeal the statutory mandate that handcuffed the Director's scheduling of substances to the

federal schedules.[8]   Instead, the Legislature built upon the narrow exception permitted for medical uses of marijuana, stating CUMMA was intended to draw "a distinction . . . between medical and non-medical uses of marijuana."   N.J.S.A. 24:6I-2(e).   Moreover, the Legislature expressed no intent to treat marijuana in the same way for all persons.

We cited this distinction in State v. Myers, 442 N.J. Super. 287 (App. Div. 2015), certif. denied, 224 N.J. 123 (2016), in rejecting the argument that CUMMA mandated a change in existing law.[9]   We observed:

> [T]he Legislature intended that "a distinction be made between medical and non-medical uses of marijuana."   N.J.S.A. 24:6I-2(e).   The Legislature stated that "the purpose of this act is to protect from arrest, prosecution, property forfeiture, and criminal and other penalties, those patients who use marijuana to alleviate suffering from debilitating medical conditions[.]"
>
> [Id. at 298 (alteration in original).]

---

[8] Although CUMMA does not mention the CDSA or, specifically, the sections applicable to the scheduling of marijuana, we may presume the Legislature is "familiar with its own enactments" and intended that CUMMA be construed to serve a purpose that is "useful and consistent" with its other enactments.   In re Trenton Ordinance 09-02, 201 N.J. 349, 359 (2010) (quoting State v. Federanko, 26 N.J. 119, 129 (1958)).

[9] The defendant argued that, because "possession of marijuana [was] no longer illegal in all instances, . . . the 'plain smell' doctrine [applied in search and seizure cases] no longer applie[d]."   Id. at 295.

The Legislature retained the criminal penalties for non-medical uses of marijuana prohibited by N.J.S.A. 2C:35-5(a)(10)-(12) and marijuana remained a Schedule I controlled dangerous substance. Id. at 298 n.7 (quoting State v. Wilson, 421 N.J. Super. 301, 310 n.4 (App. Div. 2011), certif. denied, 209 N.J. 98 (2012)).

In 2015, the Legislature enacted N.J.S.A. 18A:40-12.22(a), directing boards of education and the chief administrators of nonpublic schools to "develop a policy authorizing parents . . . to administer medical marijuana to a student" on school property. N.J.S.A. 18A:40-12.2. The statute preserved the distinction drawn by the Legislature between medical and non-medical uses of marijuana by requiring that the policy be limited to students and parents authorized to engage in the medical use of marijuana pursuant to CUMMA. See Assemb. Budget Comm. Statement to A. 4587 (June 23, 2015) ("The bill provides that conduct authorized under its provisions falls within the provisions of N.J.S.[A.] 2C:35-18 and [N.J.S.A. 24:6I-6] that provide immunity from civil and criminal liability and professional disciplinary action for persons acting in accordance with [CUMMA].")

The Director's removal of marijuana from Schedule I would effectively override the Legislature's expressed intent, a result that militates against the majority's interpretation.

### B.

Another source of extrinsic material to aid in statutory interpretation is an agency's interpretation. Although "we are 'in no way bound by an agency's interpretation of a statute or its determination of a strictly legal issue,'" Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (citation omitted), we defer to agency "expertise and knowledge in their particular fields." Caminiti v. Bd. of Trs., Police & Firemen's Ret. Sys., 431 N.J. Super. 1, 14 (App. Div. 2013). Because the Director is charged with administering the CDSA, his interpretation of the statute is entitled to "great deference." In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super. 100, 114-15 (App. Div. 2013) (quoting N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 549 (2012)). "If there is any fair argument in support of the course taken by the agency or any reasonable ground for difference of opinion among intelligent and conscientious officials," the decision should not be disturbed. Lisowski v. Borough of Avalon, 442 N.J. Super. 304, 330 (App. Div. 2015) (quoting Newark v. Natural Res. Council, Dep't of Envtl. Prot., 82 N.J. 530, 539 (1980)).

In denying plaintiff's request to reschedule marijuana, the Director noted the authority granted by N.J.S.A. 24:21-3(a) is permissive rather than mandatory.  He identified N.J.S.A. 24:21-3(c) as providing the applicable mandate regarding the scheduling of marijuana.  Because marijuana continues to be listed as a Schedule I substance on the federal schedule,[10] the Director observed, "the language of the statute requires that the substance remain scheduled consistent with federal law."

The Director also addressed and rejected the argument that CUMMA mandates a different result.[11]  He found no expression of legislative intent "to treat marijuana similar to or consistent with substances listed in Schedules II-V."  He noted further the dual expressions of legislative intent "[i]nherent in the statutory scheme" that we have recognized: that marijuana not be considered "legal" for all purposes and that CUMMA was intended

---

[10]   The Drug Enforcement Administration recently denied a petition that sought to initiate proceedings to reschedule marijuana.  81 Fed. Reg. 53,688 (Aug. 12, 2016) (to be codified at 21 C.F.R. pt. 1301).

[11] Both the Department of Health and the Board of Medical Examiners concurred that CUMMA did not either reschedule or permit the rescheduling of marijuana.  In commenting on a regulation promulgated under CUMMA, the Board of Medical Examiners stated the Legislature "did not reschedule marijuana." 43 N.J.R. 3191(b), 3192 response to comment 2 (Dec. 5, 2011). Similarly, the Department of Health determined a change in existing federal law would be necessary for a change in the classification of marijuana under New Jersey law.  43 N.J.R. 3335(a), 3340 response to comment 24 (Dec. 19, 2011).

to prevent the criminal prosecution of patients, their caregivers and physicians for the medical use of marijuana consistent with the law. Myers, supra, 442 N.J. Super. at 298.

The Director's interpretation is supported by the plain language of the statute, expressions of legislative intent and our own review of legislative action. His view was therefore entitled to deference. In sum, a review of pertinent extrinsic evidence fails to support the conclusion that subsection (a) authorizes the Director to reschedule a controlled substance in a manner that is inconsistent with the federal schedule.

IV.

Finally, I am unpersuaded by the majority's reliance upon dicta in Tate as providing support for its interpretation.

In Tate, supra, 102 N.J. at 73, the Court rejected a defendant's argument that, as a result of the TRA, the defense of necessity was available to a defendant who did not obtain a valid prescription for marijuana. In a comment not germane to that holding, the Court observed that, by enacting N.J.S.A. 24:21-3(a), the Legislature left room for the possibility that marijuana could be rescheduled with "consideration to, inter alia, current scientific knowledge." Id. at 71. The Court did not mention the federal schedules or subsection (c) at all in its opinion, let alone rule that the permissive authority

granted by N.J.S.A. 24:21-3(a) took precedence over the mandate in N.J.S.A. 24:21-3(c) that substances be scheduled consistent with federal law.

"[A]s an intermediate appellate court, we are bound by the holdings of our Supreme Court where it has spoken clearly on a subject." Moscatello ex rel. Moscatello v. Univ. of Med. and Dentistry of N.J., 342 N.J. Super. 351, 363-64 (App. Div.), certif. denied, 170 N.J. 207 (2001). As the majority acknowledges, the language relied upon is dicta, not a holding. Moreover, Tate was decided before the passage of CUMMA, in which the Legislature preserved the distinction between medical and non-medical uses for marijuana. Therefore, the Court's observation does not offer such clarity on the subject to require the result adopted by the majority.

For these reasons, I would affirm the Director's decision.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION